(C.D. 2393)

GANCIA PRODUCTS IMPORT CORP. *v.* UNITED STATES

## United States Customs Court, Third Division

(Decided April 18, 1963)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *James H. Lundquist* of counsel) for the plaintiff.

*John W. Douglas*, Acting Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges

RICHARDSON, Judge: The merchandise which is the subject of the instant protest consists of an aperitif wine that was described on the customs invoice as "Aperitivo Rosso" and which was imported at New York from Italy. Among other things, the merchandise was classified by the collector as an imitation still wine under 19 U.S.C.A., section 1001, paragraph 804 (paragraph 804, Tariff Act of 1930) in accordance with the provisions of 19 U.S.C.A., section 1001, paragraph 812 (paragraph 812, Tariff Act of 1930, as amended) and assessed for duty at the rate of $5 per proof gallon. Internal revenue taxes were also assessed against the importation, but are not in dispute.

It is claimed by the importer that the merchandise is not an imitation wine, but that it is a still grape wine, which is properly classifiable under paragraph 804, *supra*, and assessable for duty thereunder at the rate of $1.25 per gallon. The applicable provisions of the statute read as follows:

PAR. 804. Still wines, including ginger wine or ginger cordial, vermuth, and rice wine or sake, and similar beverages not specially provided for, $1.25 per gallon: *Provided*, That any of the foregoing articles specified in this paragraph when imported containing more than 24 per centum of alcohol shall be classed as spirits and pay duty accordingly.

\* \* \* \* \* \* \*

PAR. 812. \* \* \* all imitations of brandy, spirits, or wines imported by any names whatever shall be subject to the highest rate of duty provided for the genuine articles respectively intended to be represented, and in no case less than $5 per proof gallon.

The record indicates the basis of the collector's classification of the merchandise as an imitation wine to be the report of Government chemists concerning a laboratory examination of a sample of the merchandise. Attached to the invoice is a copy of a letter, dated August 8, 1958, addressed to the deputy collector in charge of the liquor and quota section at the port of entry by the Assistant Regional Commissioner of Internal Revenue, Alcohol and Tobacco Tax Division. The letter states:

Reference is made to a sample of "Gancia Aperitivo" (Entry No. 934029) imported by Gancia Products Import Corp., New York, N.Y. This sample was

submitted by you to the Regional Laboratory of this office in May, 1958, and was sent to the National Laboratory for examination.

The National Laboratory has advised that the product is made with a wine base, has an alcoholic content of 17.6% by volume, and falls within the category of aperitif wines. However, the product contains a coal tar dye and must, therefore, be labeled and taxed as an "Imitation" aperitif wine.

It has been conceded that but for the presence in the wine of coal-tar dye, a synthetic material, the wine would have been classified, as claimed. The question before the court, therefore, is whether the presence of coal-tar dye in the wine constitutes the product an imitation wine, within the meaning of paragraph 812, *supra*.

In support of the collector's classification, the Government's counsel argues that the meaning accorded to imitation wine under paragraph 812, *supra*, is the same as that given to these terms under regulations issued under the Federal Alcohol Administration Act, calling our attention to 27 CFR, section 4.21 (h) (1), which reads:

\* \* \* "Imitation wine" shall bear as a part of its designation the word "imitation," and shall include:

(i) Any wine containing synthetic materials.

(ii) Any wine made from a mixture of water with residue remaining after thorough pressing of grapes, fruit, or other agricultural products.

(iii) Any class or type of wine the taste, aroma, color, or other characteristics of which have been acquired in whole or in part, by treatment with methods or materials of any kind, if the taste, aroma, color, or other characteristics of normal wines of such class or type are acquired without such treatment.

(iv) Any wine made from must concentrated at any time to more than 80° (Balling).

The defendant takes the position that Congress intended that internal revenue and customs laws and regulations affecting importations of alcoholic beverages subject to payment of customs duties and internal revenue taxes should be administered harmoniously and interpreted uniformly between the several agencies involved in the administration of the tariff and revenue laws. While it is true that considerable interagency cooperation in the administration of the tariff and revenue laws has been provided for and encouraged by congressional action, with a view toward increased efficiency in the operations of Government, we are not prepared to say that Congress intended that meanings accorded to terms used in customs laws should necessarily be the same as meanings given to like terms in revenue laws. The development of our tariff laws antedates the development of our revenue laws. As such, the time-honored usage in our tariff laws of certain terms would, if anything, tend to influence their usage in our revenue laws rather than be influenced by their usage in such revenue laws. The language of the present paragraph 812, *supra*, dates back to our Tariff Act of 1864, and has remained substantially unchanged through the intervening tariff acts. On the other hand, section 4.21 (h) (1), *supra*, is a

creation of relatively recent origin, having been derived from authority delegated to the Secretary of the Treasury under the Federal Alcohol Administration Act, which was enacted in 1935.

Actually, the Secretary of the Treasury has not undertaken to define the terms "imitation wine" in the regulation which has been cited to us by defendant's counsel. As we read this regulation, all that the Secretary of the Treasury has undertaken to do therein is to augment the application of the terms "imitation wine" to include wines produced from or containing certain specified ingredients and characteristics, and this undoubtedly with a view toward implementation of the parent statute, one of the chief aims of which is to protect the consuming public from misrepresentation in the sale of alcoholic beverages.[1]  We do not understand this to give direction and meaning to the use of the terms "imitation wine" in the tariff sense.  And, as appears from the record, neither did the Regional Commissioner of Internal Revenue, to whom is entrusted the enforcement of the cited regulation, undertake to control the tariff usage of the terms "imitation wine" by means of such regulation in his letter to the collector as aforesaid.  For it is with precisely chosen words that the Commissioner limited his concern over the involved merchandise to the labeling and taxing requirements to which such merchandise is subject.

Our appellate court has stated the common meaning of the word "imitation" to be "an act of imitating or copying, or that which is made or produced by imitating, or a simulated reproduction or representation of the thing sought to be copied or imitated." *Stephen Rug Mills* v. *United States*, 32 CCPA 110, 113, C.A.D. 293.  In our opinion, the common meaning of the word "imitation" governs its usage in conjunction with the word "wine" in paragraph 812, *supra*.  A reading of the language of this provision as a whole clearly indicates that the importation to which the duty provided for therein attaches must be related intentionally to some other product in terms of similarity of identity.  In *United States* v. *Julius Wile Sons & Co., Inc.*, 36 CCPA 99, C.A.D. 404, our appellate court followed the common meaning of the word "imitation" in holding that an importation of a particular liqueur was not an imitation of absinthe, within the meaning of paragraph 812, *supra*, being dissimilar to an absinthe in flavor, color, and effect upon the human nervous system.  Another instance where the court adopted the common meaning of the word "imitation," as used in a predecessor to paragraph 812, *supra*, under the Tariff Act of 1909, is to be found in the case of *American Express Co.* v. *United States*, 20 Treas. Dec. 140, Abstract 24669.  That case involved a product that was designated "Champagne d'Ananas

---

[1] 27 U.S.C.A., section 205(e).

Monopole," and which was imported in a carefully wired and corked green quart bottle, inscribed with the words "Bottle should be laid on its side in a cool place." However, the customs laboratory sample analysis disclosed the fact that the beverage contained no alcohol. The merchandise was, nevertheless, held to be properly classifiable under a provision for champagne and other sparkling wines, on the theory that the importation was an imitation champagne.

Accepting the common meaning of the word "imitation" as being controlling here, we consider next whether the involved merchandise is or purports to be a copy of any other product. It is the contention of the plaintiff that the producer of the Gancia Aperitivo Rosso, as the involved merchandise is called, did not undertake to copy or reproduce any other product. The reason for the addition of the coal-tar dye to the wine in question by the producer is revealed in the direct testimony of plaintiff's witness, Mario R. Daniele, connoisseur of wines and president of the now-dissolved plaintiff corporation, a former United States representative of the Gancia brand products. After describing the process by which the involved merchandise was produced, Mr. Daniele testified (R. 13, 14):

Q. What about the addition of the coal tar dye, when is that done?—A. Well, that was done at the time the extract from the herbs and flavorings were put in. See, originally, I am sure, that they never put this coal tar dye into this particular Aperitivo Rosso, and they have made it for many years—I would guess almost a hundred years, or fifty, at least, this particular product; and they put in this coal tar dye, about four, five years ago, and it happened to have been purchased here—this pure food color was purchased in the United States and brought to Italy, and they added it to this wine for about a period, I would guess, of a year or two.

Q. Can you tell the Court why this was added?—A. Well, strictly because the name Aperitivo Rosso, Rosso meaning red in Italian, and the color of it was not tinted red from the skin of the grapes, as would normally happen. It was just a question probably of climatic condition that the grapes did not arrive to a certain amount of tanning or coloring material in the skins, and so it came out a little bit more on the brown cast than it had normally come out. So they added this fruit coloring, to sort of bring it up to that level of color and because they did not know of any objection to this they kept doing it, and were able to stabilize a little bit the color of it.

The witness further testified that it was very difficult for him to distinguish the natural Gancia Aperitivo Rosso wine from the product which contained the coal tar, even when they were both viewed together.

While there is no evidence of intent on the part of the producer of the involved merchandise to reproduce the product of any other wine producer, the testimony of record is clearly indicative of the producer's intent to copy its own product of a previous creation through color matching, and of its relative success in achieving that result. Imitation of one's own products through color matching is

not an anomalous circumstance in the food and beverage industry. As one text writer puts it when speaking of the use of coal-tar dyes in foods and beverages, "Their use in foods and beverages, becomes well nigh a necessity, particularly in instances where the natural colors of the product have diminished to such an extent as to give them a deceptive appearance of inferior quality." [2]   We think that this form of imitation through self-emulation is as much within the purview of the tariff provision in question as is any other form of imitation. We, therefore, hold that the merchandise in issue is an imitation of wine, within the meaning of paragraph 812, *supra*.   Consequently, the protest is overruled.

Judgment will be entered accordingly.

(C. D. 2394)

---

[2] Jacobs, The Chemistry and Technology of Food and Food Products (1951), page 351.